UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

DONNAMARIE GRENNAN,

                     Plaintiff,

       -against-

NASSAU COUNTY; BOARD OF COOPERATIVE
EDUCATIONAL SERVICES OF NASSAU
COUNTY; BOCES OF NASSAU COUNTY
SCHOOL BOARD; KATHLEEN ZINO, in her
official and individual capacity; RUSSELL RIGGIO,
in his official and individual capacity; CHARLES
KULIS, in his individual and official capacity;
MARGUERITE COSTELLO, in her individual
and official capacity; JAMES CAPPADONA,
in his individual and official capacity; JOHN
ZOULIS, in his individual capacity and his official
capacity; MEHRI FRYZEL, in her individual and
official capacity; JOHN GANGEMI, in his
individual and official capacity; and JERRY
SHIVELEY, in his individual and official capacity,

                   Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**MEMORANDUM & ORDER**

Civil Action No. 04-2158
(DRH)(WDW)

**APPEARANCES:**

**Law Offices of Frederick K. Brewington**
Attorneys for Plaintiff
50 Clinton Street
Hempstead, New York 11550
By:     Wendy Pelle-Beer, Esq.

**Cronin & Byczek, LLP**
Attorneys for Defendants
1981 Marcus Avenue, Suite 227
Lake Success, New York 11042
By:     Rocco G. Avallone, Esq.
          Linda M. Cronin, Esq.
          George Fontana, Jr., Esq.
          Christopher Bellistri, Esq.

**HURLEY, Senior District Judge:**

Plaintiff Donnamarie Grennan ("Grennan" or "Plaintiff") commenced this action on May 21, 2004, asserting a claim, pursuant to 42 U.S.C. § 1983, for alleged violations of her First and Fourteenth Amendment rights, and asserting state law claims for defamation, breach of contract and negligence. Presently before the Court is the motion of Defendants Board of Cooperative Educational Services of Nassau County and BOCES of Nassau County School Board (collectively "BOCES"), Kathleen Zino, Russell Riggio, Charles Kulis, Marguerite Costello, James Cappadona, John Zoulis, Mehri Fryzel, John Gangemi and Jerry Shiveley for summary judgment.[1] For the reasons set forth below, the motion is GRANTED.

## BACKGROUND

The following facts are taken from the parties' submissions and are undisputed, unless noted otherwise.[2]

---

[1] By stipulation dated May 3, 2005, the action was dismissed as against Nassau County.

[2] Local Rule 56.1 requires that on a motion for summary judgment, the moving party annex "a separate, short, and concise statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried." The Rule also provides that the opposing party shall include a "correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." The Rule specifically commands that "[e]ach statement **by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact,** must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." (Emphasis in original). In this case more than a few factual recitations were disputed without any citation to evidence. In addition, unsworn pleadings were referenced as support for factual assertions. Allegations in pleadings are insufficient to support or defeat a summary judgment motion. *See Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996); *see also* Fed. R. Civ. P. 56(e). Finally, the Court notes several instances in which the cited evidence utterly failed to provide any support for the factual assertion.

BOCES serves the more-than fifty school districts of Nassau County by providing shared services, including special education, alternative schools, technology training and career training. The speech services provided to the students at BOCES are contracted for by each student's individual school district and provided pursuant to each student's Individualized Education Plan.[3] In some cases, related services such as speech are reimbursable to the school district by Medicaid.

During the 2002–03 school year, Defendant Kathleen Zino ("Zino") was a leave replacement substitute teacher at the Center for Community Adjustment, a BOCES school. Defendant Charles Kulis ("Kulis") is the Principal at the Center for Community Adjustment, where Plaintiff Grennan was employed as a speech teacher during the 2002-03 school year. Defendant James Cappadona ("Cappadona") is the supervisor of the Speech Department at Nassau BOCES. Defendant John Zoulis ("Zoulis") is the Principal at the Nassau BOCES's

_____

[3] The term "Individualized Education Plan," or IEP, means a written statement for each child with a disability that is developed, reviewed and revised in a meeting in accordance with 34 C.F.R. §§ 300.320 through 333.324. An IEP is a mandated requirement of the Individuals with Disabilities Education Act (IDEA) for any pupil in a public school who is found to meet the federal or state requirements for special education and/or related services. An IEP is required to include, among other things: (a) a statement of the child's present levels of academic achievement and functional performance;( b) a statement of measurable annual goals, including academic and functional goals designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general educational curriculum and meet each of the child's other educational needs that result from the child's disability; (c) a description of how the child's progress toward meeting the annual goals described in 34 C.F.R. § 300.320(a)(2) will be measured and of when periodic reports on the progress the child is making toward meeting the annual goals (such as through the use of quarterly reports) will be provided; (d) a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child. *See* 20 U.S.C. §1414(d)(1)(A)(I); 34 C.F.R. § 300.320(a).

Career Development Center. Defendant Marguerite Costello ("Costello") is the Director of Human Resources for Nassau BOCES. Defendant Russell Riggio ("Riggio") is the Executive Director for Special Education for Nassau BOCES. Defendant Mehri Fryzel ("Fryzel") is the Assistant Director for Special Education of Nassau BOCES. Defendant Dr. Jerry Shiveley ("Shiveley") was, during the relevant period, the District Superintendent at Nassau BOCES. Defendant John Gangemi ("Gangemi") is Deputy Superintendent for Nassau BOCES.

Grennan is a tenured teacher of children with speech and hearing disabilities employed by BOCES. She is employed pursuant to the collective bargaining agreement (hereinafter "CBA") between BOCES and Nassau BOCES Central Council of Teachers. From the beginning of the 1997-98 school year until July 3, 2003, when she was placed on administrative leave, Grennan worked at the Center for Community Adjustment ("CCA"), a BOCES school.

The events at issue began when, sometime in late May or early June 2003, Zino, who as stated above was a substitute teacher, reported to Kulis, the principal at CCA, that she believed Grennan may not have provided speech services to one or more of her students. According to Grennan, Zino's actions were an attempt to discredit Grennan and get her job. Defendants deny any such motivation.

On May 27, 2003, prior to any action being taken by the Defendants against Grennan, a memorandum was sent by Kulis to all staff members, including Plaintiff, regarding procedures to be followed in recording speech services provided, should any student refuse such services. The Defendants contend that the memo was a direct result of prior discussions with Grennan which had addressed the pending allegations of misconduct. Grennan, however, disputes that she was made aware of the allegations against her.

4

Shortly thereafter, Kulis and Cappadona, pursuant to the instructions of Riggio, began an investigation into allegations that Grennan had not provided speech services to some students. As part of that investigation, Plaintiff's records were collected and students and teachers were interviewed. Among other things, BOCES obtained statements from five students who were part of Grennan's caseload for the 2002-03 school year. The statements are all dated June 17, 2003 and read as follows:

> Student MA: "I first saw Miss Grennan in March on Mondays and Fridays for Speech."

> Student SB: "I didn't go to speech at all this year. I don't know who my speech teacher is."

> Student JM: "I only saw my Speech teacher two times this year, yesterday and last week. She tested me around the beginning of school."

> Student JF: "I did not go to Speech at all this year. I do not have a Speech teacher."

> Student AQ: "Miss Grennan gave me a test in the fall, I think. She told me I passed it. She said she would check over me a couple of times, but she didn't cause she had other kids. She took me for Speech today and that was the first time."

On June 18, 2003, Grennan received a memorandum from Kulis requesting that she appear at a hearing on June 20, 2003, to discuss the allegations of "unprofessional conduct." June 20, 2003, was the last day of school in the 2002-03 school year. Grennan appeared at the hearing, with a union representative, where she was questioned with respect to the allegations against her. At the conclusion of the hearing, the Plaintiff was given her performance evaluation for the year, receiving a rating of "unsatisfactory." Grennan contends that she had no notice or knowledge of the allegations against her until the start of the hearing and, as a result, the hearing

5

failed to comply with Article III, Section 5 of the CBA.  The Defendants, however, point to the May 27 memo and Plaintiff's June 10, 2003 production of her log notes and attendance documents as confirmation of prior conversations with Grennan regarding her conduct.  Grennan also contends that the hearing was scheduled at the end of the day on the last day of school in order to deprive her of the ability to call teachers and students as witnesses on her behalf.

On July 2, 2003, BOCES sent a letter, signed by Riggio, to the Nassau County District Attorney's office.  The letter states in part:

> Late in this school year, our Supervisor of Speech Services and the Principal for the Center for Community Adjustment were approached by a classroom/speech teacher who expressed her concern regarding the services students in her class were not receiving.  A subsequent investigation, consistent with our teachers' contract, identified the fact that one of the program's speech teachers, Donna Grennan, had not been providing services to several students in her caseload.  Seven of these high school students had received little or no speech service, as required by the students' IEP.  Not being aware of this earlier in the school year, BOCES continued to bill local school district for these services. As best we can ascertain at this time, those bills have totaled $12,306.
> Our investigation of this issue included conversations with students and staff, other than Ms. Grennan, all of whom concur that Ms. Grennan has not been providing services, as required by IEP mandate and state and federal law.  Despite the overwhelming evidence, Ms. Grennan has denied all of our accusations.  As required by State Education law, BOCES is taking the necessary steps to suspend her, pending the implementation of a 3020A proceeding, leading to a penalty up to and possibly including termination.
> It should be noted that five of the seven students' districts have, as best we know, applied for New York State Medicaid reimbursement . . . .  Since it is the responsibility of each local school district to bill Medicaid, it is not clear to BOCES as to the amount involved.  However, knowing the monthly rate for service and the daily rate for transportation, we feel that the total amount involved could be in excess of $30,000.

As a result of the above, the Nassau County Board of Cooperative Services is quite concerned that our agency, the school districts we represent and the New York State/federal government Medicaid program has been defrauded as a result of Ms. Grennan's behavior. We are asking that this situation be thoroughly investigated by the Nassau County District Attorney's Office to determine Ms. Grennan's culpability and responsibility in this regard.

Grennan contends that there was no real investigation prior to the filing of the complaint with the Nassau County District Attorney and that if a proper investigation had been conducted she would have been vindicated. She also asserts that certain information was maliciously withheld from the District Attorney. That information included that two of the seven students were not Medicaid eligible, that the transportation costs of five of the seven students were not Medicaid eligible, and that transportation was provided so the student could attend school, whether or not speech was provided.

On the same day that the letter was sent to the Nassau County District Attorney, i.e., July 2, 2003, Grennan was advised by letter from Costello that "[e]ffectively immediately you have been placed on administrative leave at home. You are not to be on Nassau BOCES property without . . . prior knowledge and consent." While on administrative reassignment Grennan continues to receive her regular salary and benefits, although she disputes that she is receiving the "full" benefits that were previously afforded to her.

In August of 2003, Riggio spoke at a meeting of BOCES principals and assistant principals with respect to accurate reporting of services performed by teachers. Grennan contends that Riggio discussed the allegations against her at the meeting and that Defendants otherwise disclosed the allegations to her coworkers. The Defendants state that no such disclosures were made.

On September 2, 2003, Grennan was administratively reassigned to the Career Development Center (hereinafter "CDC"). As a result, Grennan filed a grievance with her union, alleging that the transfer was improper according to the procedures established by the CBA. Grennan further alleges that she was instructed by Riggio and Zoulis, the principal of the CDC, not to speak, or have any contact with staff members at her new location. The Defendants contend that Grennan was merely advised not to talk about why she was relocated to the CDC.

Following the filing of the grievance, Grennan's discontent with her placement continued. Her office was in a wing of the CDC near the auto shop, which she describes as remote and constantly invaded by gas fumes, insects, mildew and other pests and contaminants. Grennan subsequently made complaints to the New York State Department of Labor regarding the perceived condition of her office as well as the lack of a lock on the door of the bathroom closest to her office. The lock on the door was fixed and the investigation of the premises by the Department of Labor did not find any violations.

On October 3, 2003, Grennan came across what she perceived as a threatening message left in her school mailbox. The "message" was a page from a trivia calendar for Monday, September 22, 2003, and reads: "The mongoose was brought to Hawaii to kill the rats that plagued the sugar fields. Why did the plan fail? The mongoose hunts during the day – and rats are nocturnal." According to Defendants, the calendar page was either left inadvertently in Grennan's mailbox by another teacher or removed from another teacher's mailbox by Grennan.

According to Plaintiff on October 17, 2003 she complained to the Board of BOCES that, among other things, Riggio had told her to enter false information on the New York State Basic

Educational Data System ("BEDS") form.[4] She also claims to have informed the District Attorney at a meeting held on October 30, 2003 that Riggio had instructed her on or about October 3, 2003 "to falsify [BEDS] forms using her caseload registration from the previous school term 2002-2003."

On November 26, 2003, Plaintiff served BOCES with a notice of claim stating that "[f]rom about June 20, 2003, July 2, 2003, September 2, 2003 and continuing . . . claimant was caused to be defamed, discriminated against, subjected to violations of her civil rights, coerced, intimidated, not taken seriously and subjected to wrongful actions . . . ."

On January 12, 2004, Grennan was reassigned from the CDC to the Hawthorn Center, in Massapequa, New York, an act which Grennan contends was "to harass, annoy and intimidate the Plaintiff for speaking out and questioning Defendant [sic] wrongful treatment of Plaintiff." The Defendants deny such a retaliatory motive. The Defendants instead contend that the move was because of the start of renovations at the CDC and that the Hawthorn Center, which is located in the town where the Plaintiff resides, is closer to her home, and is considered prime office space. Grennan claims that, upon being transferred to Hawthorne, she was assigned the "Moll" (pronounced "mole") room located in an isolated part of the building. The Moll room shares a wall with the men's bathroom and she contends that she has to listen to men urinating and performing other bodily functions. Defendants claim that they have investigated Grennan's complaints and that no such noises can be heard in her office and, in any event, they have closed the bathroom. As for the "Moll" room, Defendants explain that there was an administrator in the

_____

[4]Neither party explains in its submissions what a "BEDS" form is or what purpose it serves.

Massapequa District named Mary Mollinsky and that apparently some of the lettering on the door sign has fallen off over the years.

By letter dated January 27, 2004, the District Attorney's office advised Riggio that they concluded their investigation and were closing this file. "It is the determination of this bureau that there is not sufficient evidence to warrant a criminal prosecution."

On May 13, 2004, the BOCES Board of Education voted charges against Grennan pursuant to Education Law § 3020-a.[5] That proceeding was still pending at the time the instant motion was submitted.

This action was commenced on May 24, 2004.

Whether or not Grennan "falsified documents" is hotly contested on this motion. It is neither appropriate nor necessary to resolve that issue on the present motion.

## DISCUSSION

### I. Standard for Summary Judgment

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*,

_____

[5] Section 3020-a of the New York Education Law, and the regulations promulgated thereunder, specify the procedure by which a tenured teacher may be dismissed or otherwise disciplined for incompetence or misconduct.

477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. See *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted). Affidavits submitted in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein." *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)). "Rule 56(e)'s requirement the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertions that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."

*Patterson*, 375 F.3d at 219 (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.* 183 F.3d 155, 160 (2d Cir. 1999)).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55. A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the district court in its determination of a summary judgment motion. *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *See id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

In deciding a summary judgment motion, a court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987). That being said, it is well-established that a non-movant cannot defeat summary judgment with nothing more than "unsupported assertions," *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995), or the allegations in its pleadings. *See Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996);

*see also* Fed. R. Civ. P. 56(e). More particularly, although "summary judgment should be used sparingly" in cases where the material fact at issue is the defendant's intent or motivation, the plaintiff must nevertheless offer some "concrete evidence" in his favor, and is "not entitled to a trial simply because the determinative issue focuses upon the defendant's state of mind." *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1998). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

## II.  The Section 1983 Claims

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983. To prevail on a § 1983, claim a plaintiff must establish that a person acting under color of state law deprived her of a federal right. *See* 42 U.S.C. § 1983; *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Thomas v. Roac*, 165 F.3d 137, 142 (2d Cir. 1999). Plaintiff asserts that Defendants violated her rights to free speech, due process of law, and equal protection of the law. Defendants have moved for summary judgment on the ground that they are entitled to qualified immunity and/or absolute legislative immunity on these claims.

### A. **Qualified Immunity**

"The qualified immunity doctrine shields governmental officials performing discretionary functions from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Poe v. Leonard*, 282 F.3d 123, 131 (2d Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Loria v. Gorman*, 306 F.3d 1271, 1281 (2d Cir. 2002).

Courts perform a two-part inquiry to determine whether an official is entitled to qualified immunity. *See Loria*, 306 F.3d at 1281. First, a court questions whether "'[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). By first answering this question, "a clear standard against which officers can measure the legality of future conduct" is provided. *Id.* (further citations omitted).

> If [a court] determine[s] that the officer's conduct did not violate a constitutional right, [it] proceed[s] no further and hold[s] that the officer is entitled to qualified immunity. However, if [a court] decide[s] otherwise, [it] proceed[s] to ask whether the right was clearly established at the time it was allegedly infringed. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*Id.* (internal quotations and citations omitted); *see also Demoret v. Zegarelli*, 451 F.3d 140, 148 (2d Cir. 2006) (same).

Accordingly, the Court will first examine whether the Defendants' actions violated Plaintiff's First Amendment, Due Process and Equal Protection rights.

### 1. First Amendment Retaliation Claims

Although a public employee "does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment," these rights are not absolute, because the public employer has a legitimate interest in regulating the speech of its employees to promote the efficiency of its public services. *See Mandell v. County of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003) (citing *Connick v. Myers*, 461 U.S. 138, 140 (1983)); *see also Garcetti v. Ceballos,* 126 S. Ct. 1951, 1958 (2006) ("A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations."); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). To plead a *prima facie* case of First Amendment retaliation, a plaintiff must establish: (1) that his speech addressed a matter of public concern; (2) that he suffered an adverse employment action; and (3) that a causal connection existed between the speech and the adverse employment action, "so that it can be said that his speech was a motivating factor in the determination." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. Of* Educ., 444 F.3d 158, 162 (2d Cir. 2006) (quoting Morris *v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)); *see also Mandell*, 316 F.3d at 382; *Locurto v. Safir*, 264 F.3d 154, 166 (2d Cir. 2001) (describing elements of First Amendment retaliation claim).

The question of whether an employee's speech addresses a matter of public concern is one of law, not fact. *See Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983); *see also Morris*, 196 F.3d at 110. The court must determine whether a public employee's speech by "content, form, and context" constitutes a matter of public concern. *Connick,* 461 U.S. at 147-48. "Speech by a public employee is on a matter of public concern if it relates 'to any matter of political, social, or

other concern to the community.'" *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003) (quoting

*Connick*, 461 U.S. at 146). "If the speech, however, is focused on matters personal to the

employee, it cannot be classified as being on a matter of public concern and the government,

acting as an employer, 'has greater latitude to discipline' the employee." *Id.* (quoting *Connick*,

461 U.S. at 146). The requirement is not that the plaintiff have absolutely no personal interest;

rather, that personal interest may not be the overriding one. *See Johnson,* 342 F.3d at 114. As

one court has recently stated: "the key inquiry is whether the statements were made by plaintiff in

her role as a disgruntled employee or her role as a concerned citizen." *McMahon v. New York*

*City Bd. of Educ.,* 2006 WL 3680624, *8 (E.D.N.Y. 2006) (quoting *Hanig v. Yorktown Cent.*

*Sch. Dist.*, 384 F. Supp. 2d 710, 722 (S.D.N.Y. 2005)).

Plaintiff points to the following as examples of her speech on public concern: (1) her

complaint filed with the New York State Department of Labor on October 24, 2003 "concerning

the terrible conditions in her work area;" (2) on October 30, 2003 she informed the District

Attorney that Riggio instructed her to falsify BEDS forms using her caseload registration from

the previous school term and that she had received a threatening note in her mailbox; (3) on

October 17, 2003 she wrote to BOCES "concerning her involuntary transfer, the threatening note

she received, being isolated, the lack of security at her office location and the ban placed on her

with respect to communicating with anyone." (Plaintiff's Mem. at p.5)

Plaintiff's communication with the District Attorney on October 30, 2003, as well as her

complaint on October 17, 2003, to the BOCES Board, both concerning falsification of the BEDS

form, satisfies the requirement of being a matter of public concern. *See, e.g., Burkybile v. Bd. of*

*Educ. of Hastings-on-Hudson Union Free Sch. Dist.,* 411 F.3d 306, 313 (2d Cir. 2005) ("Public

accusations of improper governmental actions are clearly matters of public concern, regardless of whether the accuser is motivated by personal reasons."); *Bernheim v. Litt,* 79 F.3d 318, 325 (2d Cir. 1996) (plaintiff's statements to authorities regarding principal's falsification of test scores and of student achievement were matters "of serious interest to the community"); *Peres v. Oceanside Union Free Sch. Dist.,* 426 F. Supp. 2d 15 (E.D.N.Y. 2006) (plaintiff's claim that she reported alleged illegal conduct of District and its officials adequately alleged matter of public concern entitled to First Amendment protection); *Laurentano v. Spada,* 339 F. Supp. 2d 391, 410 (D. Conn. 2004) ("A corrupt or otherwise improper decision is the most obvious example of an instance where the employee's comment upon the decision would necessarily be of public concern and courts have vigilantly protected an employee's right to expose public misconduct.").

As to all the remaining statements, this Court finds that Plaintiff was not speaking out on matters of public concern but complaining about individual instances that affected her personally. Her complaints about her "involuntary transfer" and the allegedly threatening letter she received were primarily motivated by her own self interest. *Cf. Hanig v. Torktown Cent. Sch. Dist.,* 384 F. Supp. 2d 710, 722 (S.D.N.Y. 2005) (court had "serious doubts" that complaints about school's failure to provide notice before termination were protected as they were primarily motivated and related to her personal desire to keep her job). Plaintiff's attempt to bootstrap her complaints about her working conditions to matters of public concern by claiming that they relate to public "safety" is unconvincing. *Moscowitz v. Coscette,* on which Plaintiff relies, is clearly distinguishable as the impact of police corruption on the public safety is not the same as "exposed plumbing pipes" and unclean surroundings. 3 Fed. Appx. 1 (2d Cir. 2001).

Having found that Plaintiff's communications regarding the alleged falsification of the

BEDS forms were on a matter of public concern, the Court must now determine whether Grennan has submitted sufficient evidence of actionable retaliation.

In *Burlington Northern and Santa Fe Railway Company v. White,* 126 S. Ct. 2405, 2415 (2006), the Supreme Court described actionable retaliation in the context of Title VII's anti-retaliation provisions as that which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." The Second Circuit has described actionable retaliation in the context of First Amendment retaliation claims as "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights . . . ." *Washington v. Co. of Rockland,* 373 F.3d 310, 320 (2d Cir. 2004).

In *Zelnick v. Fashion Inst. of Tech.*, 464 F.3d 217 (2d Cir. 2006), the Second Circuit discussed the *Burlington Northern* standard and found that the Circuit's standard for First Amendment retaliation claims "has always been the equivalent of the standard set forth in *Burlington Northern.*" *Id.* at 227. The *Zelnick* court also gave the following *non-exhaustive* list of adverse employment actions in the context of First Amendment retaliation claims: "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand" as well as lesser actions such as "negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities." *Id.* at 226.

In determining whether conduct is adverse, it should be noted that:

> whether an undesirable employment action qualifies as being "adverse" is a heavily fact-specific, contextual determination. . . . A plaintiff cannot support such a determination unless he can show

18

> that an alleged act of retaliation is more than de minimis. . . .
> Indeed, it would trivialize the First Amendment to hold that
> harassment for exercising the right of free speech was always
> actionable no matter how unlikely to deter a person of ordinary
> firmness from that exercise . . . .

*Id.* at 226 (internal quotations and citations omitted).

In this case, the only act which constitutes an adverse employment action is the formal initiation of a section 3020-a proceeding. *See Burkybile,* 411 F.3d at 313-14 (threat of initiation of § 3020-a proceeding constitutes an adverse action).

There are two problems with the other alleged adverse employment actions. First, as discussed below, as a matter of logic, those actions that occurred before plaintiff's protected speech occurred cannot satisfy the causal connection. That leaves only Grennan's transfer to the Hawthorne Center in January 2004.

Second, with respect to Grennan's transfer to the Hawthorne Center, it must be remembered that she was already administratively assigned to duties other than teaching. Thus, this transfer did not entail a dramatic change, or even any change, in the nature of Grennan's work. The mere fact that she viewed the surroundings in her new locale as undesirable is insufficient to meet the standard of "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *See Washington,* 373 F.3d at 320. Grennan viewed her surroundings at CDC as undesirable, as well. A transfer from one undesirable location to another one cannot be deemed adverse. Accordingly, the only adverse action was the formal initiation of § 3020-a proceedings.[6]

_____

[6] The Court notes that in her Rule 56.1 Statement Grennan asserts that her hours were changed as an act of retaliation. (Plaint. Statement at ¶ 79-80.) However, the assertion will not be addressed by this Court as the only "evidentiary" support cited for this alleged act is Plaintiff's

The Court now turns to the element of causal connection. As explained by the Second Circuit, "[t]he causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech." *Morris*, 196 F.3d at 110 (citations omitted). However, a "plaintiff may not rely on conclusory assertions . . . to satisfy the causal link." *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004) (citing *Morris*, 196 F.3d at 111). Causation can be established either indirectly or directly. *Mandell*, 316 F.3d at 383 (citing *Morris*, 196 F.3d at 110). It can be established indirectly, for example, by showing that the protected activity was closely followed by adverse treatment in employment. It can also be established directly by evidence of retaliatory animus. *Id.*

It is apparent that insofar as any adverse action took place before October 17, 2003, there can be no causal connection and therefore as to those actions Defendants are entitled to summary judgment. *Cf. McMahon*, 2006 WL 3680624, * 10 (E.D.N.Y. 2006) (finding no causal connection as a matter of logic between suspension that occurred two weeks before speech on public concern); *Carmellino v. Dist. 20 of New York City Dept. of Educ.*, 2006 WL 2583019 (S.D.N.Y. 2006) (to establish causal relationship "plaintiff must, at minimum, introduce evidence that the protected activity in question occurred before the adverse employment action"). These adverse actions include, but are not limited to, the June 20 hearing, Grennan's placement on administrative assignment on July 2, 2003, her administrative reassignment to the CDC in September 2003, and the allegedly threatening "mole" note.

As to those actions which occurred after October 17, 2003, Plaintiff relies upon a

unsworn Complaint.

temporal causation. (*See* Pl.'s Mem at 9 ("defendants took many adverse actions . . . shortly *after* she voiced protected speech") (emphasis in original).)

Temporal proximity alone may suffice to establish causation where proximity is very close. *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001); *Kessler v. Westchester County Dept. of Soc. Servs.,* 461 F.3d 199, 210 (2d Cir. 2006). In *Burkybile*, the Second Circuit acknowledged:

> [t]his Court had not established a specific delay between protected activity and adverse employment action that defeats an inference of causation. *Gorman-Bakos v. Cornell Co-op Extension,* 252 F.3d 545, 554-55 (2d Cir. 2001) (listing cases in the context of Title VII retaliation). We have in the past held that a delay of three months was fatal to a showing of causation, *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990), and that a delay of eight months supported a showing of causation, *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980).

411 F.3d at 314.

Here, the formal initiation of § 3020-a charges occurred nearly seven months after Grennan's protected speech. The passage of seven months may or may not support a finding of causality. However, in this case, it is unnecessary to rely upon only the passage of time. "Where there is evidence that the employer was considering the adverse employment action before the protected activity, the Supreme Court has held that an employer's 'proceeding along lines previously contemplated, though not definitively determined, is no evidence whatever of causality.'" *Carmellino,* 2006 WL 2583019, *18 (S.D.N.Y. 2006) (quoting *Clark County Sch. Dist.,* 532 U.S. at 272).

It is uncontroverted in this case that the process for the initiation of the § 3020-a charges began sometime in June 2003. On June 10, Grennan's records were requested. Shortly

thereafter, her students were interviewed and, on June 20, the investigatory interview of Grennan occurred.  On July 2, 2003, BOCES requested that the District Attorney conduct an investigation into the matter.  Also, Plaintiff was administratively reassigned to duties other than teaching.  All of these precursors to the filing of § 3020-a charges occurred prior to Grennan's protected speech.  Based on the evidence in the record, no reasonable jury could conclude Grennan's protected speech caused the filing of the § 3020-a charges.

Defendants are entitled to summary judgment on Plaintiff's First Amendment retaliation claims.

### 2.  First Amendment Prior Restraint/Free Association Claims

The Court's First Amendment inquiry is not at an end.  Plaintiff contends that when she was transferred to CDC in September 2003:

> Mr Riggio told me that "We would like you not to be in contact with anyone during the day unless there is an emergency of some kind."  At the conclusion of this meeting, I asked again and Defendant stated 'We do not want you interacting with other members of the staff.  It's that simple."  The Defendant Costello stated "that with this assignment you [sic] there is no need for you to be talking to other staff members." Mr. Zoulis, the principal at CCA confirmed with  me on both November 20 and 21, 2003 that I was not allowed to talk to anyone, use the faculty room. His staff members were prohibited from speaking to me.

Grennan Decl. at  ¶63; Pl. Rule 56.1 Statement at ¶¶ 50-51.[7]   According to Plaintiff, these statements constitute prior restraint that had a chilling effect on her First Amendment right to free

---

[7] Defendants dispute the statements were made . Riggio contends that he merely told Grennan to do her work and that during the day she should not interact with staff when she was supposed to be working.  Zoulis contends he only advised the Plaintiff that she should not speak about her business and why she was at CDC and that she was free to have conversations as she saw fit.

speech and freedom of association.

In so far as Plaintiff is claiming a violation of her right to freedom of association, her claim is barred as there is no generalized right of "social association" *See City of Dallas v. Stanglin,* 490 U.S. 19 (1989). In *Stranglin*, a dance hall owner challenged a city's age restriction ordinance that limited admission of patrons to certain dance halls to persons between the ages of 14 and 18, arguing the ordinance violated the First Amendment and the Equal Protection Clause. The state appellate court struck the ordinance down "holding it violated the First Amendment associational rights of minor," *id.,* because "the patrons were engaged in a form of expressive activity that was protected by the First Amendment." *Id.* at 24. The Supreme Court disagreed, holding the Constitution does not recognize a generalized right of "social association." *Id.* at 25. Noting that while "[i]t is possible to find some kernel of expression in almost every activity a person undertakes, . . . such kernel is not sufficient to bring the activity within the protection of the First Amendment." *Id.* As the *Stranglin* Court put it, recreational dancing "qualifies neither as a form of 'intimate association' nor as a form of 'expressive association'" protected by the First Amendment. *Id.*

The same is true here. There is no evidence that Grennan wished to engage in other than recreational or social association with other teachers and school personnel. Without any evidence linking her desire to socialize to a form of intimate association or to a form of expressive association, as the Supreme Court has defined those terms,[8] there is no First Amendment right to be protected.

_____

[8] *See Roberts v. United States Jaycees,* 468 U.S. 609, 617-19 (1984) (quoted with approval in *Stanglin*, 490 U.S. at 23-25).

23

Similarly, Grennan's claim of a prior restraint on her right to free speech must fail. There is no evidence that Grennan wished to speak (to her colleagues) on a matter of public concern such as in *Aebisher v. Ryan,* 622 F.2d 651 (2d Cir. 1980), upon which Plaintiff relies. As the Supreme Court recently reiterated in *Garcetti*, "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." 126 S. Ct. at 1958. It is only when employees are "speaking as citizens about matters of public concern" that public employers are limited under First Amendment jurisprudence to those speech restrictions that are necessary for the employer to operate efficiently and effectively. *See id.*

Nor is this a case where government officials encouraged the "suppression of speech in a manner which can 'reasonably be interpreted as intimating that some form of punishment or adverse . . . action will follow the failure to accede to the official's request.'" *Zieper v. Metzinger,* 474 F.3d 60, 65-66 (2d Cir. 2007) (quoting *Hammerhead Enters., Inc. v. Brezenoff,* 707 F.2d 33, 39 (2d Cir. 1983)). "In determining whether a particular request to suppress speech is constitutional, what matters is the 'distinction between attempts to convince and attempts to coerce.'" *Id.* at 66 (internal quotations and citations omitted). Plaintiff points to no evidence that Defendants intimated that some sort of punishment would follow if Grennan failed to accede to their request.[9]

---

[9] At the very least, accepting Plaintiff's version of what she was told, *see* page 22 *supra,* Defendants are entitled to qualified immunity. It was clearly lawful for Defendants to tell plaintiff that "with this assignment there is no need for you to be talking to other staff members." As to the other purported statements, reasonable school officials could disagree about the legality of Defendants' purported statements. *See generally Loria,* 306 F.3d at 1281; *Zieper*, 474 F.3d at 69-70.

Defendants are entitled to summary judgment on Grennan's prior restraint and free association claims.

### 3. Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment guarantees the right to be free from "invidious discrimination in statutory classifications and other governmental activity." *Bernheim,* 79 F.3d at 323 (quoting *Harris v. McRae*, 448 U.S. 297, 322 (1980)). "The Equal Protection Clause [thus] requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

Defendants argue that Grennan "cannot establish, nor has she ever identified, any other speech teachers who have [been] deemed to have failed to provide speech services and falsified documents relating to said speech services and were treated differently (not reassigned nor 3020-a charges filed)." (Defs.' Mem. at 19.) Plaintiff retorts that, first, the "proper pool of comparative employees include: those other teachers who were accused of wrongdoing and subjected to discipline" and second, that the evidence shows that the "individual Defendants treated Plaintiff more harshly than similarly situated teachers (those accused of disciplinary violations)." (Pl. Mem. at 13-14.)

"Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir. 2000). "To be 'similarly situated,' the individuals with whom [plaintiff] attempts to compare herself to must be similarly situated in all material respects." *Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir. 1997) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). In order to satisfy *Shumway's* "all material respects" standard a plaintiff must show "co-employees were subject to

the same performance evaluation and discipline standards."  *Graham,* 230 F.3d at 40 (citing

*Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 96 (2d Cir. 1999)).  In addition, a plaintiff

must demonstrate that the similarly situated employees engaged in comparable conduct.  *Id.*

It is Plaintiff's burden to come forward with evidence of similarly situated individuals

who were treated differently.  No such individuals are identified or discussed in Plaintiff's

Memorandum or in her Rule 56.1 Statement.  The only reference that could be construed as

referring to a similarly situated individual is the following from Grennan's Declaration:

> Ms. Costello falsely states in her affidavit at paragraph 10 that she
> placed me on "administrative reassignment . . . as I would any
> other teacher that failed to provide services to students."  Ian
> Gilman states in his affidavit that he was "disciplined" for not
> reporting that his students were not receiving speech services.
> [However,] he received a satisfactory performance evaluation and
> was not administratively reassigned as I was.  I find this difference
> in treatment unfair and disheartening

Grennan Decl. at ¶ 61.

If Grennan were correct that the appropriate pool of similarly situated individuals is those

"teachers who were accused of wrongdoing, and subjected to discipline," then a comparison to

Gilman might be appropriate.  However, as set forth above, Plaintiff must show that similarly

situated individuals engaged in similar conduct.  The conduct of which Gilman was accused  –

not reporting that his students were not receiving speech services – cannot be equated as similar

to the conduct of which Grennan has been accused  – failing to provide services and falsifying

documents to indicate that services had been received.  Thus, Plaintiff has failed to identify

similarly situated individuals who were treated differently.

Plaintiff's argument that there is sufficient evidence for a jury to conclude that her

treatment was motivated by malice and her reliance on *FSK Drug Corp v. Perales,* 960 F.2d 6,

10 (2d Cir. 1992) and *Terminate Control Corp. v. Horowitz*, 28 F.2d 1335, 1352 (2d Cir. 1994)

[Plaint. Mem at p. 15] does not save her Equal Protection claim.  In *Termite Control*, the Second

Circuit, quoting *FSK Drug*, explained that an Equal Protection violation based upon selective

application of a facially lawful state regulation is properly found when:

> (1) the person, compared with others similarly situated, was
> selectively treated, and (2) the selective treatment was motivated
> by an intention to discriminate on the basis of impermissible
> considerations, such as race or religion, to punish or inhibit the
> exercise of constitutional rights, or by a malicious or bad faith
> intent to injure the person.

*Termite Control,* 28 F.3d at 1352 (quoting *FSK Drug,* 960 F.2d at 10).  As *Termite Control* and

*FSK Drug* make clear,  for an Equal Protection claim to withstand a summary judgment motion a

plaintiff must show selective treatment compared to others similarly situated <u>and</u>, inter alia,

malicious intent.  As set forth above, there is no evidence in this record of individuals similarly

situated who were treated differently.

Accordingly, Defendants are entitled to summary judgment on Grennan's Equal

Protection claim.

### 4.  Due Process

The Due Process Clause imposes procedural safeguards on governmental decisions that

deprive individuals of liberty or property interests, within the meaning of the Fifth or Fourteenth

Amendments.  *See Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  Thus, to prevail on a

procedural due process claim under the Fifth and Fourteenth Amendments, a plaintiff must

demonstrate that she "has a property interest, created by state law,  in the employment or the

benefit that was removed." *Bernheim*, 79 F.3d at 322. *See Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995).

As a result of the June 20, 2003 investigatory hearing Plaintiff was given a negative evaluation and administratively reassigned to other than teaching duties. Her claim to due process is foreclosed by the Second Circuit's decision in *Bernheim* and New York law.

In *Bernheim*, the plaintiff asserted she was denied due process when she was deprived of the right to deliver a speech to a convention, remain in the position of library teacher, be appointed to staff developer, and have two periods per day to prepare for her classes. The Second Circuit rejected the claim as the deprivations concerned features of the plaintiff's working conditions, which are not protected by the Constitution:

> To state a cause of action under the due process clause, a plaintiff must show that she has a property interest, created by state law, in the employment or benefit that was removed. . . . The New York Court of Appeals has stated that the concept of tenure in the teaching profession "does not entitle a teacher to a specific class or proscribe assignment to proper duties of a teacher other than classroom teaching of a specific subject.". . . Furthermore, where the complained-of conduct concerns [benefits] that are within an official's discretion, entitlement to that benefit arises only when the discretion is so restricted as to virtually assure conferral of the benefit. . . . [Plaintiff] complains of acts that are alterations of working conditions that cannot provide a basis for a constitutional claim and, if in contravention of Bernheim's contractual rights, may be redressed through the employee grievance procedures and an Article 78 proceeding in the state court.

79 F.3d at 322-23 (internal citations and quotations omitted).

In this case, the only "deprivation" suffered as a result of the June 20, 2003 investigatory hearing was Plaintiff's reassignment to administrative duties. As the *Bernheim* Court noted, the property interest created by tenure does not "proscribe assignment to proper duties of a teacher

28

other than classroom teaching of a specific subject." *Id.*; *cf. Hawley v. South Orangetown Cent. Sch. Dist.,* 67 N.Y.2d 796 (1986) (a teacher suspended pending the outcome of a § 3020-a proceeding may be given a non-teaching assignment provided the duties assigned bear a reasonable relationship to the suspended teacher's competence and training and are consistent with the dignity of the profession). Supervisory personnel have the discretion to reassign a teacher to administrative duties, and that discretion extends to such an assignment pending the outcome of a § 3020-a proceeding, *id.,* and even prior to the actual filing of charges, *Appeal of Williams*, 39 Educ. Dep't Rep. 643 (1998). While supervisory personnel do not have discretion to assign administrative duties that bear no relationship to a teacher's area(s) of competence or that are inconsistent with the dignity of the profession, there is no such contention by this Plaintiff.

Plaintiff simply was not entitled to question her accusers or call witnesses at the June 20, 2003 investigatory hearing. Indeed, under New York law, the only right that Plaintiff had with respect to the June 20, 2003 "hearing" was the right to union representation during her questioning. *See New York City Transit Auth.,* 35 PERB ¶ 3029 (2002), *confirmed,* 196 Misc. 2d 526, 36 PERB ¶ 7009 (Sup. Ct. Kings County 2003). Plaintiff concedes that she was afforded, and took advantage of, the right to have a union representative present.

Plaintiff is entitled to question her accusers and call witnesses, among other rights, during her § 3020-a proceeding. The procedures laid out in § 3020-a of the New York Education Law provide "more than adequate procedural safeguards to satisfy . . . due process rights under the Fourteenth Amendment." *Montefusco v. Nassau County,* 39 F. Supp. 2d 231 (E.D.N.Y. 1999) (quoting *Sullivan v. Bd. of Educ. of Eastchester Union Free Sch. Dist.,* 131 A.D.2d 836, 838 (2d

Dept. 1987)).

The fact that Defendants may have put a critical letter in Plaintiff's file does not entitle her to the procedural safeguards set forth in § 3020-a. "The [New York] Court of Appeals has held that a written communication from a school administrator to a tenured teacher criticizing the teacher's performance or conduct may be made part of the teacher's permanent personnel file without affording him a hearing pursuant to Education Law § 3020-a. . . . The court likened those documents to administrative evaluations, which school district supervisory personnel have a right and a duty to make as an adjunct to their responsibility to supervise the faculty of schools." *Tebordo v. Cold Spring Harbor Cent. Sch. Dist.,* 126 A.D.2d 542, 543 (2d Dept. 1987) (internal citations and quotations omitted).

Accordingly, Defendants' motion for summary judgment on Grennan's Due Process claim is granted.

**B. Legislative Immunity**

The individual Defendants claim they are entitled to summary judgment since they are protected by the doctrine of absolute immunity for actions taken pursuant to legislative functions. Given the Court's ruling above, it is unnecessary to address this issue. [10]

---

[10]Absolute legislative immunity extends to local legislators. *Carlos v. Santos*, 123 F.3d 61, 66 (2d Cir. 1997). In *Bogan v. Scott-Harris,* 523 U.S.44, 54 (1998) the Supreme Court held that whether an act is legislative "turns on the nature of the act, rather than on the motive or intent of the official performing it." Accordingly, "immunity depends on the nature of the act itself, not on the identity of the actor performing it." *Harhay v. Town of Ellington Board of Education*, 323 F.3d 206, 210 (2d Cir. 2003).

In the present case, the individual Defendants' investigation was not part of a quintessentially legislative decision as in *Carlos,* 123 F.3d at 64. Rather, like *Harhay,* Defendants' actions were administrative in nature – part of the process by which the employment situation of Grennan was resolved. Thus, the individual Defendants are not entitled to absolute legislative immunity.

## C.  **The 1983 Claims against BOCES**

Having determined that Grennan's claims against the individual Defendants fail because there was no violation of her constitutional rights, then her claims against BOCES necessarily fail as well.  *See Clubside Inc. v. Valentin,* 468 F.3d 144, 161 (2d Cir. 2006).

## *III. The Defamation Claim*

Under New York Law, in order to establish a defamation claim, a plaintiff must prove 1) a defamatory statement of fact, 2) regarding the plaintiff, 3) published to a third party, 4) by the defendant, 4) with injury to the plaintiff.  *See, e. g. Boyd v, Nationwide Mutual Ins. Co.,* 208 F.3d 406, 409  (2d Cir. 2000).

According to Plaintiff's 56.1 statement, the following defamatory statements were made:

> (1) in or about May 2003 Zino falsely alleged that Plaintiff had not provided speech therapy to students (Plaint. Statement ¶ 17-18).;

> (2) on or about August 2003, Riggio told all principals and assistant principals that the overhaul in record keeping was implemented because of certain acts attributed to Grennan and in turn these principals told their staff members that the changes were due to Grennan's alleged acts *(id.*  ¶¶ 22-23);

> (3) on or about July 1, 2003, BOCES filed a complaint with the Nassau County District Attorney's office falsely alleging that Plaintiff filed false documents concerning her billing of speech services to Medicaid (*id.* ¶¶ 41-42);

>  (4) "Defendants informed its employees and Plaintiff's peers she was being investigated for her alleged failure to provide speech therapy services to seven students and for filing documentation that she had provided those services although they knew these charges to be false" (*id.* ¶ 44);

> (5) on or about July or August 2003, Riggio informed all principals

and assistant principals that the Plaintiff was being investigated by the Nassau County District Attorney's office for malicious intent to falsify documents and filing with a government agency (*id.* ¶ 48);

(6) on or about September 2, 2003, Zoulis told his entire staff that a speech teacher was going to be at CDC building as a "mole" as well as making other disparaging and defamatory statements including Plaintiff being investigated for failing to providing speech therapy services to several statements and falsifying documents which indicated that she had provided such services (*id.* ¶ 52); and

(7) on or about September 2, 2003, in each school that BOCES serviced, all principals told their staff members that a speech teacher was being brought up on charges of fraud by the District Attorney's office and that the speech teacher would be convicted and sent to jail, which references were about Grennan (*id.* ¶¶ 53-54).

With respect to any statement allegedly made prior to August 26, 2003, the motion for summary judgment is granted on the basis that Plaintiff failed to comply with the requirements of New York Education Law § 3813 and New York General Municipal Law § 50-e.

Section 3813(2) of the Education Law provides in relevant part:

No action . . . founded upon tort shall be prosecuted or maintained against any of the parties named in this section [which includes Boards of Cooperative Educational Services] or against any teacher or member of the supervisory or administrative staff or employee where the alleged tort was committed by such teacher, or member, or employee acting in the discharge of his duties within the scope of his employment and/or under the direction of the board of education, trustee or trustees, or governing body of the school unless a notice of claim shall have been made and served in compliance with section fifty-e of the general municipal law.

N.Y. Educ. Law § 3813(2). *See also Sainato v. Western Suffolk Boces,* 242 A.D.2d 301, 301 (2d Dept. 1997) (presentment of notice of claim within three month of when claim arises is a condition precedent to the commencement of proceeding against Western Suffolk BOCES).

New York General Municipal Law 50-e, which is referenced in § 3813, requires that a plaintiff must file a notice of claim prior to commencement of an action against a municipality, and must serve the notice of claim within ninety (90) days after the claim arises. N.Y. Gen. Mun. Law § 50-e. It is well settled that compliance with Education Law § 3813 is a condition precedent to commencement of an action against a school board, its members or employees. *P.J. Panzeca, Inc. v. Bd. of Educ., Union Free Sch. Dist. No. 6,* 29 N.Y.2d 508 (1971). "The notice of claim requirements apply equally to state tort claims brought as pendent claims in a federal civil rights action." *Warner v. Village of Goshen Police Dept.,* 256 F. Supp. 2d 171, 175 (S.D.N.Y. 2003). The burden is on the plaintiff to plead and prove compliance with the requirements of § 3813. *Panzeca,* 28 N.Y.2d at 508; *Stoetzel v. Wappingers Cent. Sch. Dist.*, 166 A.D.2d 643, 644 (2d Dept. 1990).

There is no dispute that a notice of claim was required for the alleged defamatory statements at issue. Indeed, all of the alleged defamatory statements at issue were made within the scope the Defendants' duties. *See, e.g., Gondal v. New York City Dept. of Educ.,* 19 A.D.3d 141 (1st Dept. 2005) (notice of claim required for defamation claim for injurious statement made regarding teachers performance); *Agins v. Darmstadter,* 153 A.D.2d 600 (2d Dept. 1989) (superintendent's comments to district personnel regarding investigation of teacher were made in course of official duties); *Haberbush v. Christensen*, 103 A.D.2d 996 (3d Dept. 1984) ( notice of claim required where complaint alleged defendant was an employee of school district and his tortious conduct was attributable to the District). Further, there is no dispute that Plaintiff's notice of claim was not served until November 26, 2003. Nor does Plaintiff dispute that she never moved in an appropriate state supreme or county court to file a late notice of claim under

the provisions of N.Y. Gen. Mun. Law § 50-e or N.Y. Educ. Law §3813(2-a). Rather, it is

argued that the defamation was continuing in nature and that she was not aware of the

defamatory comments until after August 26, 2003. (Plaint. Mem at 21.)

The law in New York is clear. Each utterance gives rise to a separate cause of action and

the cause of action arises upon utterance. *See Egleston v. Kalamarides,* 58 N.Y.2d 682, 684

(1982); *Williams v. Varig Brazilian Airlines,* 169 A.D.2d 434, 437 ( 1st Dept. 1991); *Municipal*

*Training Center v. Nat'l Broadcast'g Corp*., 87 Misc.2d 1044 (Sup. Ct. N.Y. County 1976).

Insofar as the statements by Zino and the accusations made at the June 20 hearing, the

argument that Plaintiff was not aware of the defamatory comments is not supported by the

evidence. For example, ¶ 34 of Plaintiff's 56.1 Statement states: "Plaintiff was accused at the

disciplinary hearing that she had not serviced her speech students and that she had filed false

documents indicating that she had. Defendants also accused her of Medicaid fraud." Similarly,

in her declaration Grennan swears that at the June 20 hearing "Riggio and Fryzel alleged that

teachers and students had supposedly made certain statements about my failure to provide speech

services." [Grennan Decl. at ¶ 32.] Thus, Grennan cannot dispute that she was aware of Zino's

allegations and the June 20 allegations at least by June 20, 2003. Thus, her notice of claim as to

these statements was untimely.

As to the letter sent to the District Attorney, Plaintiff has not submitted any admissible

evidence that she learned of the letter after August 26, 2003. Although Plaintiff's 56.1 statement

asserts that when she returned to school she learned that Defendant had filed a complaint with the

Nassau District Attorney, the reliance on the Complaint as support therefore (*see* ¶ 43) is not

sufficient to raise an issue of fact. *See Gottlieb,* 84 F.3d at 518 (party may not rely on allegations

in pleadings to defeat a motion for summary judgment). Nor does the reliance on paragraph 64

of her Declaration provide support for her contention. Paragraph 64 merely states that Plaintiff

learned that when she returned to school that *Riggio had stated* that "there is a D.A. investigation

of a speech teacher for malicious intent to falsify documents." The cited paragraph does not state

that is when she learned of the investigation. Finally, the Court notes that in her declaration

Grennan avers that she "was never *formally advised* that Defendants had filed a complaint with

the District Attorney's office (¶ 38) (emphasis added) and that in July 2003 she "did not know

*formally* what steps were being taken by Defendants with respect to their articulated accusations

(¶ 39) (emphasis added). [11] These assertions are insufficient to establish the Grennan did not

know of the letter to the District Attorney's office prior to August 26, 2003. Accordingly,

summary judgment is granted as to the first three statements.

The Court now turns to the remaining alleged defamatory statements. Despite the

completion of discovery (*see* Docket No. 56), except for one statement, Plaintiff has not put forth

---

[11]In any event, even if not barred by the failure to file a timely notice of claim, the letter to the District Attorney is privileged as an employer has a qualified privilege to share evidence of an employee's wrongdoing with law enforcement. *See Boyd,* 208 F.3d at 409-10. *Cf. Sullivan v, Bd. of Educ. of Eastchester Union Free Sch. Dist.*, 131 A.D.2d 836, 839 (2d Dept. 1987) (defamatory utterances in statement of charges absolutely privileged); *Ennis v. Bd. of Educ. of Somerville Cent. Sch. Dist.,* 248 A.D.2d 665 (2d Dept. 1998) (same). In order to overcome the privilege, plaintiff was required to show that the statement was false and that defendants "abused the privilege by acting beyond the scope of the privilege, acting with common law malice or acting 'with knowledge that the statement was false or with reckless disregard as to its truth.'" *Id.* at 410. While there is a question of fact as to the truth of the allegations contained in the letter to the District Attorney, there is no evidence to support any of the other factors. Even if, as Grennan contends, there was no investigation, a failure to investigate does not permit a finding of reckless disregard of the truth. *Id.*

sufficient admissible evidence that any of the alleged statements were made.[12]

Plaintiff relies upon the affidavit of Erin Shea which states:

> On September 2003, at a meeting of all speech teachers, we were told that these new procedural changes were being put into place because a speech teacher was not servicing students. We were also told that a speech teacher was being investigated for malicious intent to falsifying documents. We all knew this to be Donna Grennan. To this day the other teachers and staff members believe that these changes were put in place due to Donna Grennan's alleged wrongdoing.

Aff. of Erin Shea, sworn to January 31, 2006, at ¶ 7. Conspicuously absent from the Shea affidavit is any identification of the speaker of the statements. *See Peres v. Oceanside Union Free School District,* 426 F. Supp. 2d 15, 28 ( A defamation plaintiff must "identify the alleged defamatory statement, *the person who made the statement,* when the statement was made, and the third parties to whom the statement was published") (emphasis added). Accordingly, there is no evidence as to who published the alleged statement. *See generally Boyd*, 208 F.3d at 410.

In her own declaration, Grennan states: "I was also informed by Mr. Dreaper that Mr. Riggio made this same comment to his building principals prior to the September 2, 2003 Teacher Orientation Day and that each building administrator shared their version of the comment/story with their respective staff members that day." Aff. of Donnamarie Grennan, sworn to February 3, 2006, at ¶67. As Grennan has no personal knowledge and relies solely on hearsay, her affidavit does not provide admissible evidence of a defamatory statement by any Defendant. Nor has Grennan submitted an affidavit from Mr. Dreaper setting forth the basis of his knowledge, which would also appear to be based on hearsay. Rather, Grennan relies on a

---

[12] Defendants have objected to the proffered support for the defamatory statements. *See, e.g,* Defs. Reply to Pl. 56.1 Statement at ¶¶ 22, 23, 42, 53, 54; Defs. Mem at 27.

letter, unsworn and written by Mr. Draper, which states in relevant part:

> [Y]our letter omits the fact that Mr. Riggio personally made the
> following statement on September 2, 2003 at separate meetings
> held with speech teachers, psychologists/social workers and
> OT/PT's to wit: "There is a D.A. (District Attorney) investigation
> of a speech teacher for malicious intent to falsify legal documents."
>
> At a Second Level Grievance Hearing held on September 15, 2003,
> Mr Riggio admitted that he made that statement, which was
> witnesses by Dr. Marquerite Costello, Mrs. Grennan and myself.
> Furthermore, Mr. Riggio shared this comment with his building
> principals prior to the September 2, Teacher orientation Day. Each
> of these building administrators shared their version of the
> comment/story with their respective staff(s) on that day.
> Also it was reported to me that Mr. Zoulis (Principal/CDC) wanted
> to forewarn his staff that a 'mole' had been placed in the school - -
> which referred to Mrs. Grennan and her involuntary transfer to the
> site (in violation of the contract).
> It appears that the statement made by Mr. Riggio and his agents are
> to be considered as collegial gossip disparaging and defaming Mrs.
> Grennan's reputation as a professional member of the staff, which
> is unfair, unwarranted, untrue and inflammatory.

Plaintiff's Ex. Q. Again, the letter is hearsay and the statements made in the letter appear, at

least in part, to be based on hearsay.

The Court cannot consider such evidence on a motion for summary judgment. *See H.

Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454-55 (2d Cir. 1991) (instructing that hearsay

assertion that would not be admissible if testified to at trial is not competent material for a Rule

56 affidavit); *see also Sarno,* 183 F.3d at 160 ("Rule 56 provides that an affidavit submitted in

opposition to summary judgment 'shall be made on personal knowledge, shall set forth such facts

as would be admissible in evidence, and shall show affirmatively that the affiant is competent to

testify to the matters stated therein.'") (quoting Fed. R. Civ. P. 56(e)).

The only admissible evidence of any of the aforementioned alleged defamatory statements is found in the last sentence of the following sworn statement:

> When I returned to school, I learned from my union president Mr. Dreaper, that the Defendant Riggio personally stated at the September 2, 2003 meetings with speech teachers, psychologists/social workers and occupational therapists and physical therapists that 'There is a D.A. investigation of a speech teacher for malicious intent to falsify legal documents." Further at a second level grievance hearing held on September 15, 2003 regarding my involuntary transfer, *Defendant Riggio admitted that he made that statement which was heard by* [others] and *myself.*

Grennan Aff. at ¶64 (emphasis added); *see also* Grennan Dep. 81-83 (Riggio admitted making the statement but denied using Grennan's name). Plaintiff's sworn statement that Defendant Riggio made such an admission is competent non-hearsay. *See* Fed. R. Evid. 801(d)(2). Accordingly, the Court must address Defendants' other arguments for judgment on the defamation claims.

Defendants' first argument is that truth is a complete defense. Under the law of New York it is "fundamental that truth is an absolute unqualified defense to a civil defamation action." *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d Cir. 1986); *DeSanti v. Internat'l Bro. Teamsters,* 2006 WL 490116 (S.D.N.Y. 2006). "It is an equally fundamental concept that 'substantial truth' suffices to defeat a charge of libel. . . . A statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced. . . . Thus, under New York law, it is not necessary to demonstrate complete accuracy to defeat a charge of libel. It is only necessary that the gist or substance of the challenged statements be true." *Jewell v. NYP Holdings, Inc.,* 23 F. Supp. 2d 348, 366 (S.D.N.Y. 1998) (internal quotations and citations omitted). *Accord Masson v. New Yorker Magazine Inc.,*

501 U.S. 496, 517 (1991) ("Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge is justified.").

First, it is important to emphasize that the statement at issue is <u>not</u> that a speech teacher in fact maliciously falsified documents. As noted earlier, whether that is the case is hotly contested on this motion. Rather the statement at issue is that "[t]here is a D.A. investigation of a speech teacher for malicious intent to falsify legal documents." Here, there is no dispute that at the time of the statement, as a result of BOCES July 2, 2003 letter and the meeting held the same date between BOCES and the District Attorney's office, the Nassau County District Attorney's Office was in fact investigating whether Grennan submitted documents indicating that she had provided speech services required by "IEP mandate" and whether "New York State/federal government Medicaid program has been defrauded as a result of Ms. Grennan's behavior." Thus, the statement at issue is substantially true. *Cf. Jewell,* 23 F. Supp. 2d at 369 (statement that plaintiff was the main or prime suspect substantially true where plaintiff was a suspect); *Chung v. Better Health Plan,* 1997 WL 379706, *2-3 (S.D.N.Y. 1997) (statement that plaintiff had a sexual harassment lawsuit pending against her employer and that she had been terminated held substantially true when plaintiff had an EEOC charge pending and had been constructively discharged); *Miller v. Journal-News,* 211 A.D.2d 626, 627 (2d Dept. 1995) (statement that plaintiff was suspended was substantially true where plaintiff had been placed on administrative leave). While the word "maliciously" as opposed to "wrongfully" initially may give one pause, a reasonable person hearing the statement would not have reacted differently based on the different terminology. As to the statement at issue, application of the above principals on the record before this Court requires, as a matter of law, summary judgment in favor of Defendants

39

as the statement is substantially true.

Summary judgment is granted in favor of Defendants on Plaintiff's second cause of action for defamation.

### IV.  The Breach of Contract Claim

Defendants have moved for summary judgment on the third cause action entitled "breach of contract."  They argue that the Plaintiff is required to follow the grievance procedure set forth in Article VII of the CBA and cannot pursue a breach of contract action without first pursuing the grievance procedure and exhausting her administrative remedies. In response, Plaintiff confusingly argues that:

> Plaintiff's breach of contract claim arose when Defendants breached their duties pursuant to the collective bargaining agreement when Defendants willfully violated Plaintiff's state, federal and/or constitutional rights.  The complaint states that Defendants, through wrongful and discriminatory treatment of Plaintiff, constituted breach of the CBA.  As such, the constitutional violation is the crux of the Plaintiff's breach of contract.  Furthermore, the Defendant's violative acts against Plaintiff, which are subject of Plaintiff's breach of contract claims, are of the exact type that are prohibited by (and subject to) federal anti discrimination laws. "Where a dispute 'ultimately concerns not the application or interpretation of any collective bargaining agreement, but the meaning of a federal statute the presumption found in the Labor Management Relations Act do not apply . . . . "Collective bargaining arbitration provisions are unenforceable insofar as they purport to waive an employee's right to a federal forum in an action based on federal employment discrimination statutes." . . . In addition, it is important to note that Defendants provided a bald theory, that Plaintiff's contract claim is governed by the CBA.  However, Defendants utterly failed to provide any analysis, whatsoever, to support that constitutional violations are in fact covered by this collective bargaining agreement upon which Defendants rely.

Pl. Mem at 28-29.

If Plaintiff's breach of contract claim is not based on the CBA then summary judgment is granted as Plaintiff, who bears the burden of proof, has failed to put forth evidence of any other relevant contract.

To the extent that Plaintiff is arguing that the CBA incorporates specific "state, federal and/or constitutional rights," summary judgment is granted as Plaintiff has failed to put forth any evidence of that incorporation and the Court's own review of the CBA fails to reveal any such incorporation.

Finally, Plaintiff's reliance on those cases holding that an employee-plaintiff's claim under federal statutes protecting constitutional rights is not subject to a collective bargaining agreement's binding arbitration clause, *e.g. Fayer v. Town of Middlebury,* 258 F.3d 117 (2d Cir. 2001), is misplaced. Defendants are not arguing that Plaintiff's § 1983 claims are subject to the CBA's grievance procedure, but rather that the breach of contract claim is subject to the CBA's grievance procedure. As Defendants' put it "Plaintiff's Breach of Contract claim is what it is, a Breach of Contract claim, and as such, it is governed by the CBA." Defs. Reply Mem. at 13. To the extent Plaintiff is claiming a violation of any of the contractual provisions of the CBA, summary judgment is granted for failure to submit evidence of compliance with the grievance procedures set forth therein. *See, e.g., Sheridan v. Town of Orangetown*, 21 A.D.3d 365 (2d Dept. 2005). *See also Vaca v. Sipes,* 386 U.S. 171, 184 (1967) (employer may defend action on the ground that the exclusive remedies of a collective bargaining agreement have not been exhausted before an employee resort to the courts).

Defendants' motion for summary judgment on the breach of contract claim is granted.

41

***IV. The Negligent Investigation Claim***

Defendants have moved for summary judgment on the fourth cause of action for negligence on the ground that New York does not recognize a cause of action of negligent investigation. Plaintiff does not address the issue in their opposing papers.

As New York does not recognize a cause of action for negligent investigation, *see, e.g., Coleman v. Corporate Loss Prevention Assoc., Inc.,* 282 A.D.2d 703 (2d Dept. 2001), summary judgment is granted in favor of the Defendants on the fourth cause of action.

***CONCLUSION***

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED in its entirety. The Clerk of Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
      March 29, 2007

/s/ _____
Denis R. Hurley
Senior District Judge